UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLA MOORE,<br>    *Plaintiff*,<br><br>v.<br><br>CONNECTICUT DEPARTMENT OF CORRECTION,<br>    *Defendant*.[1] | No. 3:19-cv-1063 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Carla Moore, an employee of the Connecticut Department of Correction ("DOC"), filed suit against the DOC. Moore alleges that the DOC violated her rights under Title VII of the Civil Rights Act of 1964 by retaliating against her for engaging in protected conduct and by subjecting her to a hostile work environment based on her race.[2] The DOC moves for summary judgment on all claims. For the reasons set forth below, the DOC's motion is GRANTED IN PART AND DENIED IN PART.

**I.      Factual Background**

The facts set forth below are taken from the parties' Local Rule 56(a) statements and are undisputed unless otherwise noted.

Moore, an "African American female," is employed by the DOC as a records specialist. ECF No. 28-2 at ¶¶ 1-2; ECF No. 29-1 at Section A, ¶¶ 1-2. She is assigned to the Corrigan-Radgowski Correctional Center, ECF No. 28-2 at ¶ 3; ECF No. 29-1 at Section A, ¶ 3, a prison

---

[1] This Court's docket erroneously lists two defendants, the State of Connecticut and the Department of Correction. As the Connecticut Department of Correction notes in its motion for summary judgment, ECF No. 28-2 at 1, n.1, the Complaint (ECF No. 1) lists only one defendant—the Connecticut Department of Correction. The Clerk is instructed to terminate the State of Connecticut as a defendant.

[2] Moore's complaint also included state law claims, but those claims have been dismissed. ECF No. 26.

1

in Uncasville, Connecticut.  Corrigan-Radgowski has two buildings, the Corrigan building and the Radgowski building.  *Id.*  As a records specialist, Moore is responsible for creating a daily list that indicates where and when inmates must be transported for court appearances and for notifying the lieutenant when there is a court trip.  ECF No. 28-2 at ¶¶ 4-5; ECF No. 29-1 at Section A, ¶¶ 4-5.

At some point during the course of her employment with the DOC, Moore observed a Confederate flag license plate in the rearview window of another DOC employee's personal vehicle parked in the lot of the Radgowski building, where Moore worked at the time.  ECF No. 28-2 at ¶ 45; ECF No. 29-2 at 7-8.[3]  Moore walked by this vehicle with the Confederate flag plate displayed at least one hundred times.  ECF No. 29-1 at Section A, ¶ 46.[4]  According to Moore, on at least some of those occasions the truck was parked in a parking space in such a way that the Confederate flag plate was "impossible to miss as you exit the building."  ECF No. 29-2 at 8.  According to Moore, the presence of the Confederate flag plate was "always on [her] mind" and "it really -- it hurt … [i]t really hurt[] to see that."  ECF No. 28-4 at 32.  She perceived the Confederate flag plate's presence in the Radgowski parking lot as "a sign that told [her] that [she] was unwelcome and unsafe and would not be considered equal to any of [her] white coworkers."  ECF No. 29-2 at 9.  According to Moore, she complained about the plate to her supervisor, Counselor Supervisor Jaime Richardson, in early 2018, but Richardson did not do anything about it.  ECF No. 29-2 at 7-8; ECF No. 28-4 at 32.

---

[3] This ruling cites ECF page numbers throughout.
[4] Moore asserts that she walked by the vehicle a hundred times before she reported it to Supervisor Oles, but she says that she had previously reported it to Supervisor Richardson.  ECF No. 29-1 at Section A, ¶ 46.  Her interrogatory responses state that there "were probably hundreds of times that I walked past the vehicle."  ECF No. 29-2 at 8.

On May 30, 2018, Moore made a mistake on the court list for that day. ECF No. 28-2 at ¶ 7; ECF No. 29-1 at Section A, ¶ 7. This mistake led to an inmate missing a court appearance. ECF No. 28-4 at 9. Richardson came to Moore's office at about 10:00 a.m. and asked her about the missed court trip. ECF No. 28-2 at ¶ 8; ECF No. 29-1 at Section A, ¶ 8. (Moore and Richardson did not share an office space; they worked in different offices on the same corridor, which were separated by another office. ECF No. 28-2 at ¶ 6; ECF No. 29-1 at Section A, ¶ 6.) Richardson asked Moore why Moore thought that someone else should have caught the mistake, and Moore responded: "the information that the inmate has for court, time and location, as well as the incorrect notation on it, should have been enough, not to catch the mistake, but … for someone to ask a question about it. That's something that should have prompted a question, in my mind." ECF No. 28-2 at ¶¶ 9-10; ECF No. 29-1 at Section A, ¶¶ 9-10. During this conversation, which lasted for a couple of minutes, Richardson stood over Moore while Moore sat at her desk. ECF No. 28-2 at ¶¶ 11-12; ECF No. 29-1 at Section A, ¶¶ 11-12. Then, Richardson crossed the office to the door as if to leave, and Moore got up from her desk. ECF No. 28-2 at ¶ 13; ECF No. 29-1 at Section A, ¶ 13.

Instead of leaving, Richardson shut the door, turned around "in a rage," and began to approach Moore while pointing and screaming and with "spittle … coming out of her mouth." ECF No. 28-2 at ¶ 14; ECF No. 29-1 at Section A, ¶ 14. Richardson said, "I heard you were talking shit about me." ECF No. 28-2 at ¶ 15; ECF No. 29-1 at Section A, ¶ 15. Moore responded that Richardson "[didn't] mean that much to [her] for [Moore] to be talking about her." ECF No. 28-4 at 21. Twice, Moore asked Richardson to stop pointing at her. ECF No. 28-2 at ¶ 16; ECF No. 29-1 at Section A, ¶ 16. Eventually, Richardson turned around and left

Moore's office. *Id.* Richardson was in Moore's office for a total of about four or five minutes. ECF No. 28-2 at ¶ 17; ECF No. 29-1 at Section A, ¶ 17.

According to Moore, she spoke with Anne Jackson, Administrative Assistant to Deputy Warden Sharonda Carlos, on May 30 immediately following the incident, when Deputy Warden Carlos was unreachable. ECF No. 29-1 at Section B, ¶ 10. She explained the incident to Jackson and told her that she needed to see Carlos right away. ECF No. 29-2 at 8. On May 31, 2018, Moore emailed Carlos and asked to meet with her. ECF No. 28-2 at ¶ 18; ECF No. 29-2 at Section A, ¶ 18. On June 4, Moore emailed her coworker, Mary Haeseler, asking how long she had to file a workplace violence complaint. ECF No. 28-2 at ¶ 19; ECF No. 29-1 at Section, A ¶ 19. Haeseler responded, "I'm not really sure. I think you're supposed to report it immediately." *Id.* According to Moore, she was afraid to complain because, as a black woman, she felt that DOC policy is not always the same for people of color as it is for others. ECF No. 28-4 at 23. On June 5, Moore met with Deputy Warden Carlos. ECF No. 28-2 at ¶ 25; ECF No. 29-1 at Section A, ¶ 25. During that meeting, Moore handed Carlos a document describing the May 30 incident. *Id.* According to Moore, Carlos instructed her to prepare an Incident Report, ECF No. 29-1 at Section A, ¶ 25, which she then did. ECF No. 28-2 at ¶ 21; ECF No. 29-1 at Section A, ¶ 21. In her Incident Report, Moore stated that on May 30, 2018 at approximately 10:00 a.m., Richardson came towards Moore in Moore's office, pointing at Moore and screaming that she knew that Moore was "talking shit" about her. ECF No. 28-2 at ¶¶ 21-22; ECF No. 29-1 at Section A, ¶¶ 21-22. In that Report, Moore also stated that Richardson's behavior was unprovoked, and that Moore felt as though Richardson would try to strike her if she got close enough. ECF No. 28-2 at ¶¶ 22-23; ECF No. 29-1 at Section A, ¶¶ 22-23. Moore also stated that during the interaction, she asked Richardson twice to stop pointing at her and that

Richardson stopped pointing after the second request. ECF No. 28-2 at ¶ 24; ECF No. 29-1 at Section A, ¶ 24. Moore never filed a complaint regarding the May 30 incident with the Affirmative Action or Human Resources Offices. ECF No. 28-2 at ¶¶ 39, 47; ECF No. 29-1 at Section A, ¶¶ 39, 47. Moore was familiar with the Affirmative Action Office because she had previously reached out to that office for a separate issue unrelated to this lawsuit. ECF No. 28-2 at ¶ 54; Section A, ECF No. 29-1 at ¶ 54.

On June 6, Deputy Warden Carlos and Warden Faucher reviewed Moore's Incident Report. ECF No. 28-2 at ¶ 26; ECF No. 29-1 at Section A, ¶ 26. Faucher then forwarded the Incident Report to the District Administrator, who decided to have the facility monitor the situation between Moore and Richardson. ECF No. 28-2 at ¶ 27; ECF No. 29-1 at Section A, ¶ 27. On June 6, Carlos met with Moore and Richardson separately. ECF No. 28-2 at ¶ 28; ECF No. 29-1 at Section A, ¶ 28. During those meetings, Carlos asked each of them to remain professional at all times, and she issued both employees copies of DOC Administrative Directives 2.17 ("Employee Conduct") and 2.22 ("Workplace Violence Prevention Policy"). *Id.*

On June 13, Moore filed a Supplemental Incident Report in which she stated that she thought that the May 30 incident was workplace violence and that she had been fearful at work every day since the incident. ECF No. 28-2 at ¶¶ 29-30; ECF No. 29-1 at Section A, ¶¶ 29-30. Upon receiving the Supplemental Incident Report, Warden Faucher separated Moore and Richardson by moving Richardson to a different building. ECF No. 28-2 at ¶ 31; ECF No. 29-1 at Section A, ¶ 31. Moore was never again supervised by Richardson. ECF No. 28-2 at ¶ 42; ECF No. 29-1 at Section A, ¶ 42. When Richardson ceased supervising Moore, Justin Oles became Moore's supervisor. ECF No. 28-2 at ¶ 44; ECF No. 29-1 at Section A, ¶ 44.

Faucher also sent the Supplemental Incident Report to the District Administrator. ECF No. 28-2 at ¶ 31; ECF No. 29-2 at Section A, ¶ 31. It was then sent up the chain of command to the DOC Commissioner, who ordered that the DOC Security Division conduct an investigation. ECF No. 28-2 at ¶ 32; ECF No. 29-1 at Section A, ¶ 32. Captain Julie Kunkel was assigned to conduct the investigation. ECF No. 28-2 at ¶ 33; ECF No. 29-1 at Section A, ¶ 33. As part of her investigation, Kunkel interviewed Moore. *Id*.

At the close of her investigation, Kunkel produced a report, which is dated October 2, 2018. ECF No. 28-4 at 56. Kunkel made the following findings:[5]

> a. The plaintiff stated that she tried to contact Deputy Warden Carlos on the date of the incident, May 30, 2018, and left a message with the Deputy Warden's secretary. I reviewed the secretary's carbon copy message pad and there was no entry showing that the plaintiff called Deputy Warden Carlos on that day.
> b. The plaintiff stated that she tried to contact Deputy Warden Carlos several times from May 30, 2018 through June 13, 2018, and that she spoke with the secretary during those dates. There were no entries on the message pad showing that the plaintiff called Deputy Warden Carlos during that time period.
> c. The plaintiff did not recall sending an email to Deputy Warden Carlos on May 31, 2018. I refreshed her recollection and asked her why she did not put in the email that it was an urgent matter. The plaintiff responded that she would not put that in an email and that she had already spoken [to] the secretary.
> d. On June 4, 2018, the plaintiff sent another email to Deputy Warden Carlos stating that she needed to speak with her about something "very important." I found that this was inconsistent from the plaintiff's testimony that she would not put something like that in writing.
> e. The plaintiff told me that she had prepared a narrative as soon as the incident occurred on May 30, 2018. However, the plaintiff did not send this email until May 31, 2018, thus indicating that the narrative was not written as soon as the incident occurred.
> f. The plaintiff said that she asked Deputy Warden Carlos to ask Richardson to keep the door open when Richardson was in the office with the plaintiff. Deputy Warden Carlos said that the plaintiff did not make this request.

---

[5] Moore does not deny that Kunkel made these findings, but she argues that Kunkel's report "speaks for itself" in that it is "on its face … extremely hostile to [Moore] and, among other things, asserts that [Moore] was lying and should be disciplined." ECF No. 29-1 at Section A, ¶ 34.

> g. The plaintiff claimed that, on May 30, 2018, Richardson was screaming and pointing at her and would strike the plaintiff if she was close enough to the plaintiff. The plaintiff offered no details about where and when Richardson stopped her approach to the plaintiff or about how close Richardson got to the plaintiff. Conversely, Richardson testified that she kept her hand on the door the entire time, signifying that Richardson was not approaching the plaintiff. Richardson testified that the plaintiff was the one who approached her, and that the plaintiff was holding a file that should have been returned to the file drawer right near the plaintiff's desk, making it unnecessary for the plaintiff to approach Richardson.
> h. In her work place violence complaint, the plaintiff stated she was afraid of Richardson. I asked the plaintiff what she was afraid of Richardson doing to her. The plaintiff stated her evaluations and work performance. An evaluation and work performance do not rise to the level of work place violence.
> i. Between May 30, 2018 and June 13, 2018, Deputy Warden Carlos asked the plaintiff several times if she felt safe or if she felt that she was in physical danger by Richardson. The plaintiff stated that she felt safe.
> j. The plaintiff said that when she found out that the situation was going to be monitored, she felt scared because Deputy Warden Carlos is almost never there. The plaintiff later contradicted herself by stating that she told Deputy Warden Carlos that she felt safe because she knew the situation would be monitored.

ECF No. 28-4 at 49-51. Kunkel ultimately concluded that Moore had "submitted no evidence of work place violence" and that she "did not want to be supervised by Richardson or held accountable for her work performance." *Id.* at 51. Kunkel determined that Moore's allegations were "fabricated and unfounded" in violation of Administrative Directive ("A.D.") 2.17, which provides that "[e]ach employee shall promptly report to a supervisor any threat, harassment, physical or verbal abuse, assault or act of intimidation" and that "[l]ying or giving false testimony during the course of a Department investigation" is prohibited. *Id.* at 49. Moore was familiar with A.D. 2.17 and was reminded of it by Deputy Warden Carlos on June 6, some days before she submitted the Supplemental Incident Report alleging workplace violence. ECF No. 28-2 at ¶ 36; ECF No. 29-1 at Section A, ¶ 36.

7

After Kunkel completed her report, it was sent to the DOC Commissioner, who then forwarded it to John Bishop in Human Resources. ECF No. 28-2 at ¶ 37; ECF No. 29-1 at Section A, ¶ 37. Bishop made the decision to issue Moore a one-day suspension. *Id.*[6] According to the DOC, Bishop decided to issue the suspension because of Moore's "untruthfulness and her delay in filing the workplace violence complaint." ECF No. 28-2 at ¶ 38. Moore denies that this was the actual basis for her suspension, citing as support Bishop's assertion that he made the decision to issue the suspension "based … on the investigation that was completed by Captain Julie Kunkel after the plaintiff submitted a Supplemental Incident Report." ECF No. 29-1 at Section A, ¶ 38; ECF No. 28-4 at 83. Moore acknowledged at her deposition that she does not know how the decision to discipline a DOC employee is made. ECF No. 28-2 at ¶ 40; ECF No. 29-1 at Section A, ¶ 40. When asked what evidence she had that her one-day suspension was issued in retaliation for her complaint against Richardson, Moore responded: "I can't find it. But I'm just going to say that I was an excellent employee for all those years and it didn't warrant a day off, what happened. And I didn't feel that I was given fair consideration when Security Division did the interview." ECF No. 28-2 at Section A, ¶ 41; ECF No. 29-1 at ¶ 41; ECF No. 28-4 at 38-39.

Meanwhile, on November 13, 2018, Moore reported to Oles (her new supervisor) that she was offended by a Confederate flag license plate in the rearview window of an employee's personal vehicle parked in the Radgowski parking lot. ECF No. 28-2 at ¶ 45; ECF No. 29-1 at Section A, ¶ 45. Moore walked by this vehicle with the Confederate flag plate displayed at least one hundred times before she made the complaint to Oles. ECF No. 29-1 at Section A, ¶ 46.

---

[6] It is unclear, based on the evidence before the Court on this motion for summary judgment, when Moore was suspended. Drawing all reasonable inferences in favor of Moore, as I must at this stage, *see Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013), I assume this discipline was imposed soon after the date of Kunkel's report.

According to Moore, she had tried reporting the plate to one supervisor (Richardson), and she was now trying again with another. ECF No. 28-4 at 32. Oles completed an Incident Report based on Moore's complaint, which was forwarded to the Affirmative Action Office. ECF No. 28-2 at ¶ 48; ECF No. 29-1 at Section A, ¶ 48. Affirmative Action conducted an investigation into the complaint. ECF No. 28-2 at ¶ 50; ECF No. 29-1 at Section A, ¶ 50. As part of that investigation, someone from Affirmative Action interviewed Moore on April 2, 2019. *Id.* Affirmative Action concluded that the display of the Confederate flag license plate violated A.D. 2.1 and that the employee should be directed to remove the license plate or cover it up while on duty. ECF No. 28-2 at ¶ 51; ECF No. 29-1 at Section A, ¶ 51. The DOC has not presented evidence that the plate was in fact removed or covered up. *See* ECF No. 29-1 at Section A, ¶ 53. Afterward, Moore found herself waiting longer than usual in the sally port when the coworker who was asked to remove the plate was assigned to that post, but she did not complain to anyone about this. ECF No. 28-2 at ¶ 64; ECF No. 29-1 at Section A, ¶ 64.

Over the course of her employment with the DOC, Moore's evaluations have always been satisfactory or better. ECF No. 28-2 at Section A, ¶ 55; ECF No. 29-1 at ¶ 55. She has always been able to get her work done, including after filing her complaints about Richardson and the Confederate flag plate. ECF No. 28-2 at ¶¶ 55-58; ECF No. 29-1 at Section A, ¶¶ 55-58.

According to Moore, the following retaliatory actions were taken against her in (in addition to her one-day suspension): (1) she was refused time longer than two hours to attend worker's compensation appointments; (2) Human Resources did not consider a statement from Moore's coworker, Mary Haeseler, that Moore's union representative produced to Human Resources; (3) when Moore filed an incident report regarding a supervisor calling her at home while she was out sick, Deputy Warden Cotta asked her if she thought the incident warranted an

incident report; (4) Deputy Warden Cotta told her to retype incident reports she completed regarding contact with Richardson separate from the workplace violence complaint discussed above; (5) she was not allowed to combine her two 15-minute breaks with her 30-minute lunch break, as her non-black coworkers were, in violation of the union contract; (6) Oles did not address a situation where another employee was not providing her information she needed to do her job; and (7) she was no longer invited to certain workplace celebrations.  ECF No. 28-2 at ¶ 59; ECF No. 29-1 at Section A, ¶ 59 and Section B, ¶¶ 8, 14; ECF No. 29-2 at 3, 16-20.  The workplace celebrations were held by a department Moore was not in, and her coworkers in her department also were not invited.  ECF No. 28-2 at ¶¶ 61-62; ECF No. 29-1 at Section A, ¶¶ 61-62.  She never complained to anyone about not being invited to the gatherings.  ECF No. 28-2 at ¶ 63; ECF No. 29-1 at Section A, ¶ 63.  Moore filed an incident report on December 10, 2018, in which she stated that she was "told by DW Cotta that I need to do a[n] … incident report following an email I sent to HR."  ECF No. 28-2 at ¶ 60; ECF No. 29-1 at Section A, ¶ 60.  According to Moore, the retaliation ceased after she complained to her State Senator about it.  ECF No. 229-1 at Section B, ¶ 7.

    **II.**    **Legal Standard**

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the

evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### III.  Discussion

#### A.  Retaliation Claim

Moore alleges that she was retaliated against in violation of Title VII, which prohibits employers from retaliating against an employee because the employee engaged in conduct protected by that statute. 42 U.S.C. § 2000e-3(a). The burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to retaliation claims brought under Title VII. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). To make out a *prima facie* case of retaliation in response to a motion for summary judgment, "a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014). Once an employee establishes a *prima facie* case, the burden shifts to the employer to present evidence of a non-retaliatory rationale for the adverse employment action. *Cox*, 760 F.3d at 145.

If the employer does so, the burden shifts back to the employee to present evidence "demonstrating that the stated rationale is mere pretext." *Id*.

I conclude that Moore has failed to make out a *prima facie* case of retaliation. And, even if she had done so, the DOC would still be entitled to summary judgment on her retaliation claim because it has offered a legitimate, non-retaliatory reason for its decision to issue Moore a one-day suspension, and Moore has failed to present any evidence that could permit a reasonable juror to infer that this stated reason was pretextual.

1. <u>Prima Facie Case: Adverse Action</u>

The DOC does not dispute that Moore's one-day suspension constituted adverse action. While Moore asserts that she suffered other forms of adverse action, in addition to the one-day suspension, none of the other conduct Moore describes is sufficient to support a *prima facie* case of retaliation. The other conduct Moore describes—which includes denial of permission to take more than two hours off to attend worker's compensation appointments, disregard of a statement submitted on Moore's behalf in connection with an HR proceeding, an instruction to retype an incident report, a question regarding whether the filing of an incident report was really warranted, denial of permission to combine shorter breaks with a lunch break, disregard of a minor conflict with a coworker, and lack of invitation to workplace celebrations held by another department—would not "deter a reasonable employee from making … a discrimination claim." *Cox*, 760 F.3d at 145. Further, for much of the conduct described, Moore has failed to present any evidence of a causal connection between the conduct described and her protected activity. The Local Rule 56(a) statements do not specify the dates when most of this purportedly retaliatory conduct occurred, in many instances do not identify the people who engaged in the conduct, and do not include any direct evidence that the conduct was motivated by retaliation.

As a result, the only adverse action relevant to Moore's retaliation claim is her one-day suspension from work.

### 2. Prima Facie Case: Protected Conduct

The Complaint alleges that Moore made two complaints—one about the display of the Confederate flag (ECF No. 1 at ¶ 9) and the other about an incident where a supervisor "approached [Moore] in a physically threatening manner, screaming and pointing at her" (*Id.* at ¶¶ 10-11). The Complaint further alleges that "[i]n retaliation for having made the said complaint, [Moore] – who in a quarter century of employment never had received any discipline whatever – was suspended without pay for one day." *Id.* at ¶ 12. In her response to the DOC's motion for summary judgment, Moore appears to argue that she was retaliated against for her complaint about the Confederate flag plate. *See* ECF No. 29 at 5 ("This case is about the blatant display of the Confederate flag at the entrance to the prison.") The DOC argues in its reply that when asked at her deposition to which complaint paragraph 12 of her Complaint referred, Moore testified that it referred to her workplace violence complaint. *See* ECF No. 30 at 2.

While a relevant page of Moore's deposition has not been presented to the Court, it is nevertheless clear from the portions available that defense counsel asked Moore what complaint she was referring to in the phrase "in retaliation for having made the said complaint." ECF No. 28-4 at 37. That language quotes directly from paragraph 12 of the Complaint. In response, Moore confirmed that this language referred to her "complaint against Jaime [Richardson] about workplace violence." *Id.* Further, subsequent questioning from defense counsel makes clear that defense counsel understood from Moore's answer that the protected conduct underlying Moore's retaliation claim was her workplace violence complaint. For example, defense counsel asked Moore, "what evidence do you have that the one-day suspension was issued in retaliation for

13

your complaint against Ms. Richardson?" *Id.* at 38. Later, while discussing Moore's assertion that she was no longer invited to celebrations at work, Moore explained that another coworker was no longer invited, and defense counsel inquired, "do you know if [the coworker] has ever filed a complaint against Ms. Richardson?" *Id.* at 42. Taken together, these questions—and Moore's answers—indicate that Moore testified at her deposition that she believed she was retaliated against for filing a workplace violence complaint against Richardson, and that defense counsel reasonably understood Moore to be alleging retaliation based on the workplace violence complaint. Thus, I conclude that Moore's retaliation claim is based upon her workplace violence complaint, not her complaints regarding the Confederate flag plate.

Moore's workplace violence complaint, however, does not constitute protected conduct under Title VII. Title VII prohibits an employer from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. It does not prohibit workplace violence or other workplace misconduct. Thus, Moore's complaint about the May 30 incident with Richardson does not constitute protected conduct under Title VII, and, as a result, she cannot establish a *prima facie* case of retaliation.

### 3. Non-Retaliatory Reason and Pretext

Even if Moore's workplace violence complaint was protected conduct (and she was able to establish the other elements of a *prima facie* case), the DOC has supplied a non-retaliatory reason for Moore's one-day suspension, and Moore has failed to present any evidence that this reason is pretextual. The DOC has presented evidence that Moore received the suspension due

to her "untruthfulness and her delay in filing the workplace violence complaint." ECF No. 28-2 at ¶ 38. Bishop, the HR employee who made the decision to suspend Moore, made the suspension decision based on the investigation completed by Kunkel. ECF No. 28-4 at 83. Kunkel concluded, based upon her investigation, that Moore's workplace violence allegations were "fabricated and unfounded" in violation of A.D. 2.17, which prohibits employees from "[l]ying or giving false testimony during the course of a Department investigation" and requires that "[e]ach employee … promptly report to a supervisor any threat, harassment, physical or verbal abuse, assault or act of intimidation." ECF No. 28-2 at ¶ 33; ECF No. 29-1 at Section A, ¶ 33. Thus, the DOC has presented evidence that Moore was suspended due to her violation of A.D. 2.17, rather than in retaliation for having filed the workplace violence complaint.

The DOC having supplied a non-retaliatory rationale for the decision to issue the suspension, the burden shifts back to Moore to present evidence that this stated rationale is "mere pretext." *Cox*, 760 F.3d at 145. Moore has failed to meet her burden of showing pretext. While she asserts in her Local Rule 56(a)2 statement that Kunkel's investigative report is "extremely hostile" to her, ECF No. 29-1 at Section A, ¶ 34, she has presented no evidence indicating that Kunkel's claim that she believed that Moore had fabricated her allegations was false. She has also presented no direct evidence that Kunkel or Bishop or anyone else involved in investigating her complaint and deciding to discipline her had the desire or intent to retaliate against her for filing the complaint against Richardson. Thus, even if Moore could establish a *prima facie* case of retaliation, her retaliation claim would fail because she has failed to present evidence from which a reasonable juror could infer that the DOC's stated reason for Moore's suspension was pretextual.

B. **Hostile Work Environment Claim**

Moore also asserts that she was subjected to a hostile work environment in violation of Title VII. "To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2020) (quoting *Harris*, 510 U.S. at 21 (1993)). "Whether the challenged conduct is sufficiently severe or pervasive depends on the totality of the circumstances." *Aulicino*, 580 F.3d at 82 (internal citations and quotation marks omitted). Among the factors courts consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148 (quoting *Harris*, 510 U.S. at 23). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id*. (internal quotation marks omitted). Further, "[w]hile the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that while a mild, isolated, incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." *Id.* (internal quotation marks and alteration omitted) (emphasis in original). In addition to showing that her work

16

environment was subjectively and objectively hostile, a plaintiff must show that "the conduct occurred because of [the relevant protected characteristic]." *Alfano*, 294 F.3d at 374.

Finally, a plaintiff "must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 128, 150 (2d Cir. 2004). "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* at 152 (internal quotation marks omitted).

Moore has presented evidence that she subjectively perceived her work environment to be hostile. *See Alfano*, 294 F.2d at 374. She testified at her deposition that the presence of the Confederate flag plate was "always on [her] mind" and that "it hurt … [i]t really hurt[] to see that." ECF no. 28-4 at 32. She perceived its presence in the Radgowski parking lot as "a sign that told [her] that [she] was unwelcome and unsafe and would not be considered equal to any of [her] white coworkers." ECF No. 29-2 at 9. She also presented evidence that the truck was parked in the Radgowski parking lot in such a way that the Confederate flag plate was "impossible to miss as you exit the building," ECF No. 29-2 at 8, and that she walked by it at least a hundred times on her way into and out of work. ECF No. 29-1 at ¶ 46. While the DOC argues that Moore's ability to continue to do her work despite the presence of the Confederate flag plate indicates that its presence was not severe enough to create a hostile work environment, ECF No. 28-1 at 15, the "suggestion that a hostile work environment claim cannot stand where a plaintiff is still able to successfully perform the basic functions of his or her job is without merit." *Terry*, 336 F.3d at 149. Thus, Moore's evidence that she encountered the Confederate flag plate frequently, that she found its presence "really hurt[ful]" and a sign she was

17

"unwelcome and unsafe," and that it affected her workday by being "always on [her] mind" is sufficient to satisfy the subjective prong at this stage.

With respect to the objective prong, I cannot conclude that no reasonable juror could find that walking by an image of a Confederate flag every day immediately before entering and immediately upon leaving the workplace would not alter a black employee's conditions of employment for the worse. *See Terry*, 336 F.3d at 148. The evidence discussed in the prior paragraph regarding Moore's subjective perception of the Confederate flag plate's effect on her work environment could support the conclusion that its presence was pervasive, in that Moore walked past it at least one hundred times while exiting and exiting her workplace. A reasonable juror could also conclude based on the evidence Moore has presented that being forced to walk past a Confederate flag daily at one's workplace could have a severe impact in light of its potentially threatening or humiliating effect upon a black observer. In addition, Moore's averment that the flag was "impossible to miss" as one left the building suggests that her white co-workers were aware of it, which could prove to be further isolating and humiliating.

Finally, Moore has presented evidence indicating that her employer knew about the Confederate flag plate—and Moore's concerns about it—but "did nothing about it." *See Feingold*, 366 F.3d at 152. In addition to her comments that the flag was "impossible to miss" as one exited the building where she worked, Moore has presented evidence that she complained to Richardson about the plate in early 2018 but that Richardson did not follow up and the plate remained in place. ECF No. 29-2 at 7-8; ECF No. 28-4 at 32. In addition, while the undisputed facts show that Oles and others within the DOC hierarchy responded promptly to Moore's November 2018 complaint about the plate, there is no evidence that her coworker was actually forced to remove or cover up the plate while the vehicle was in the Radgowski parking lot.

Interpreting the evidence in the light most favorable to Moore, as I must at this stage, *see Caronia*, 715 F.3d at 427, I conclude that a reasonable juror could find based on the evidence Moore has presented that the DOC was aware of the Confederate flag plate for several months but did not take steps to remove it.

As Moore has presented evidence that can support the conclusions that she subjectively experienced her work environment as hostile, that a reasonable employee in her position would also experience that work environment to be hostile, and that the DOC was aware of the conduct creating that hostility but at least initially did nothing to address it, the DOC is not entitled to summary judgment on her hostile work environment claim.  Because Moore's evidence regarding the display of the Confederate flag plate is sufficient to support this conclusion, I do not address whether other conduct described in the summary judgment record could support a hostile work environment claim.

### IV.      Conclusion

Defendants' motion for summary judgment (ECF No. 28) is GRANTED as to Moore's retaliation claim and DENIED as to Moore's hostile work environment claim.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            September 24, 2021