UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLA MOORE,<br><br>*Plaintiff*,<br><br>v.<br><br>STATE OF CONNECTICUT DEPARTMENT OF CORRECTION,<br><br>*Defendant*. | No. 3:19-CV-01063 (MPS) |

**MEMORANDUM OF DECISION**

Plaintiff Carla Moore, a former employee of the Connecticut Department of Correction (the "DOC"), alleges that the DOC violated her rights under Title VII of the Civil Rights Act of 1964 by subjecting her to a hostile work environment based on her race.[1] Moore claims that a fellow DOC employee's display of a Confederate flag license plate in the window of his truck while it was parked at the entrance to the facility where she worked created a hostile work environment, and that the DOC is liable because it was aware of the plate but failed to take appropriate remedial action. The Court held a bench trial on May 23, 2022, and now sets forth its findings of fact and conclusions of law, Fed. R. Civ. P. 52(a)(1), which can be summarized as follows: without deciding whether the display of the plate created a hostile work environment, the Court concludes that Moore failed to meet her burden of proving by a preponderance of the evidence that the DOC failed to take appropriate remedial action. Accordingly, the Court enters judgment in favor of the DOC.

**I.  FINDINGS OF FACT**

---

[1] Moore earlier asserted a Title VII retaliation claim and various state law claims, but those claims have all been dismissed in earlier rulings. *See* ECF Nos. 26 and 32.

The Court makes the following findings of fact based on witness testimony, trial exhibits, and proposed findings of fact submitted with the parties' joint trial memorandum (ECF No. 64).[2]

Moore is an African-American woman who was employed by the DOC from approximately 1993 until March 31, 2022. (Moore Test.; ECF No. 64 at 8 (Plaintiff's proposed findings) and 11 (Defendant's proposed findings).) At the time of the events at issue in this suit, she worked as a records specialist at the Corrigan-Radgowski Correctional Center, in the Radgowski building. (*Id.*)

At some point, perhaps as early as the beginning of 2017,[3] Moore saw a Confederate flag vanity plate displayed in the rear window of a pick-up truck that was parked next to the entrance of the Radgowski building with the back of the truck facing the building, such that a person exiting the building could see the plate. (Moore Test.; *see also* Exs 1-4 (photos of truck with plate).) Moore found the plate's presence "horrifying," but she did not make a complaint about it at the time she first saw it. (Moore Test.)

Moore first complained about the plate on November 13, 2018, when she made a verbal complaint to her supervisor, Justin Oles. (Ex. 502 at 2; *see also* Oles Test.) Oles had seen the plate before, but he had not reported it because he didn't know enough about the First Amendment to know whether the truck owner had the right to display it. (*Id.*) Once Moore raised the issue, however, Oles felt it was right to report the plate to his superiors, and he did so. (*Id.*) The DOC had received no other complaints regarding the plate before Moore's, nor had it

---

[2] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

[3] Moore testified that she first saw the plate in the beginning of 2017. (Moore Test.) Her incident report indicates that she had been seeing the flag for "approximately 1 year" as of November 13, 2018. (*See, e.g.*, Ex. 504.)

2

previously received any complaints about displays of any sort in personal vehicles parked in DOC parking lots. (Darin Test. at 65-66.)

On November 30, Moore submitted a written complaint stating:

> On 11/27/2018 and dozens of times during this year, I was offended by a staff member[']s pickup truck backed in the parking space right next to the flag pole in the front of the Radgowski building. When exiting the building both staff and the public have a direct view of a confederate flag vanity plate in the back window of the pickup truck which is highly offensive to people of color.

Ex. 5. The captain to whom Moore emailed the written complaint informed her on December 3 that Oles had already filed a written incident report and asked Moore to transfer what she had written to a supplemental incident report, which Moore did on December 6. (*Id.*; Ex. 504.)

On December 5, Deputy Warden Ronald Cotta reviewed the incident report prepared by Oles and forwarded it to the Warden, Stephen Faucher, for "further review." (Ex. 501 at 3.) A staff attorney within the DOC's Legal Affairs Unit recommended to Faucher that the complaint be referred to the DOC's Affirmative Action Unit ("Affirmative Action"). (Ex. 506.) She also noted that she had "consulted with Lori Kolakowski regarding removing the flag from view while on state property" and that Kolakowski was "going to run the question by OLR [the Office of Labor Relations] and advise." (*Id.*)

On December 7, Faucher forwarded the "incident report" containing all paperwork regarding Moore's complaint (including Oles's report and Moore's supplemental report) to District Administrator Edward Maldonado, recommending that the matter be reviewed by Affirmative Action. (Ex. 505.) "[A]round December 7th," Holly Darin, who supervises Affirmative Action, "heard from Legal or HR that there was an incident report coming up." (Darin Test. at 57.) Darin began discussing the complaint with HR and Legal Affairs because it was a "case of first impression" and "[t]here w[ere] some First Amendment rights at play." (*Id.*)

3

On December 13, Cotta spoke to the owner of the vehicle with the Confederate flag plate, Correctional Officer Eric Walls. (Ex. 503; *see also* Darin Test. at 60.) Cotta told Walls that another staff member found the plate offensive and asked if he would voluntarily remove the plate while his car was on state property. (*Id.*) Walls refused to do so. (*Id.*) Walls stated that he had displayed the plate in his vehicle for years and that "it was not meant to be offensive, but part of his heritage . . . ." (*Id.*)

On December 20, Maldonado referred Moore's complaint to Deputy Commissioner Monica Rinaldi, recommending that the incident be reviewed by Human Resources and Affirmative Action. (Ex. 508.) Affirmative Action formally received the referral on that date, and it reached out to both Legal Affairs and the OLR for guidance on how to handle the complaint. (Darin Test. at 59-60; Ex. 507 at 2.) Affirmative Action decided to reach out to the OLR because that office handles all employee grievances and disciplinary issues and so could advise on whether DOC could discipline Walls for the plate and on whether it could order him to remove it. (Darin Test. at 59.)

A few weeks later, on January 9, 2019 Darin reported to the Deputy Commissioner's office that she had not yet made a determination regarding Moore's complaint because she had had to reach out to Legal Affairs and the Attorney General's Office. (Ex. 507 at 1-2; *see also* Darin Test. at 61.) Darin also indicated that she "hope[d] to have a better idea on how best to proceed shortly." (*Id.*)

On January 15, the Deputy Commissioner's office sent an email checking on the status of the investigation, and Nicole Anker, the director of Legal Affairs, responded, "[s]till waiting on AGs office to chime in. They're working on it." (Ex. 507 at 1.) As of that date, Affirmative

4

Action had not taken any action regarding the complaint "because [the unit] was still waiting to hear back from the AG's office and legal." (Darin Test. at 62.)

On February 19, the Deputy Commissioner's office followed up again regarding the status of the investigation. (Ex. 509 at 2.) Darin responded: "I heard back from legal last week and need to write a memo." (*Id.*) Although Darin indicated in her response that she hoped to get the Deputy Commissioner an answer regarding the complaint by the end of the week (*id.*), she realized, upon further review of Moore's complaint, that "it wasn't exactly clear whether [Moore] was alleging a hostile work environment or harassment based upon protected class" because Moore indicated in her complaint that "she was offended by the [C]onfederate flag and that the [DOC] had a duty to do something when someone was offended." (Darin Test. at 63). While Darin "d[idn't] disagree" that the DOC has "an obligation to take a serious proactive stance against issues that offend all state employees," the Affirmative Action Unit has "jurisdiction . . . [only] over complaints of harassment or discrimination based upon a protected class." (*Id.* at 64.) Darin decided to have one of the investigators working under her supervision take a statement from Moore to clarify the basis for her complaint to ensure that it fell within Affirmative Action's jurisdiction. (*Id.* at 64-65; *see also* Ex. 509 at 1 (March 6, 2019 email from Darin to the Deputy Commissioner's office stating that Darin "ha[d] determined . . . that Affirmative Action w[ould] retain [Moore's complaint] for the purposes of taking the statement of . . . Moore" and that Affirmative Action would "be in a better position to decide how best to move forward" after doing so).)

The investigator interviewed Moore on March 15. (*See* Ex. 510 (email from investigator stating that he would be interviewing Moore on March 15 in the Radgowski building); Ex. 511 (documentation of interview).) During that interview, in response to questions from the

5

investigator, Moore stated that she had complained because the flag plate "represent[ed] the unfairness toward people of color," "symboliz[ed] racism," and "ma[de] [her] feel like [she was] being singled out, not being treated like other people are."  (Ex. 511 at 4-5)

On March 29, the investigator emailed Moore to find a time for her to review and sign her interview statement.  (Ex. 512.)  The statement was not immediately ready for Moore's review following her interview because the investigator had to prepare it by transcribing a recording of the interview and also because the investigator would have been busy handling other investigations.  (Darin Test. at 69.)  Moore ultimately signed the statement on April 2.  (Ex. 511 at 3.)

Darin then prepared an investigation report stating that the display of the Confederate flag plate in the Radgowski parking lot constituted a violation of DOC Administrative Directive 2.1(J)(2) (ex. 514; *see also* Darin Test. At 70-72), which prohibits "harassment," defined as "unwelcome verbal or physical conduct based on a legally protected class when such conduct has the effect of creating an intimidating, hostile or offensive working environment," including "[d]emonstrations of a racial or ethnic nature such as use of gestures, pictures or drawings which would offend a particular racial or ethnic group" (ex. 518 at 3).  She recommended that the Correctional Officer displaying the plate be required to remove or cover it while his vehicle was parked in a DOC parking lot.  (Ex. 514; *see also* Darin Test. at 70-72.)  The report made no recommendation regarding whether the Correctional Officer should be disciplined, as HR— rather than Affirmative Action—handles issues related to discipline.  (Darin Test. at 72.)  The report was dated May 15, 2019, and it was addressed to then-Deputy Commissioner Angel Quiros and then-Commissioner Rollin Cook.  (Ex. 514.)

HR received and reviewed Darin's report on May 15, returning it to her the same day with a concurrence in Darin's findings and recommendation but no recommendation that Walls be disciplined. (Ex. 513; Darin Test. at 73-74.) Darin then forwarded the report to the Deputy Commissioner of Operations, who received it on May 16, reviewed and concurred with Darin's findings and recommendation, and forwarded the report to Cook on May 20. (*Id.*) Cook received the report on May 20, reviewed and signed it, with a statement that the "[e]mployee should be ordered to remove the vanity plate or otherwise cover it when it is on any DOC property," and returned it to Affirmative Action on May 23. (*Id.*)

At 2:01pm on May 23, Darin emailed Warden Anthony Corcella, directing that "the facility . . . issue an order to CO Walls" requiring him "to remove the vanity plate or otherwise cover it when it is on DOC property." (Exs. 515, 517; Darin Test. at 74-75.) Upon receipt of Darin's email, Corcella and Cotta spoke to Walls and ordered him to cover or remove the plate. (Ex. 516; *see also* Cotta Test.) Corcella responded to Darin's email at 2:47pm informing her that he and Cotta had observed Walls removing the plate from the window of the truck. (*Id.*)

Moore did not see the Confederate flag plate again after Walls was ordered to remove it, and she testified that removal of the flag plate made a difference in how she felt about her work environment. (Moore Test.)[4] The DOC received no other complaints about the flag plate after May 23, 2019. (Darin Test. at 78.) Moore continued to work for the DOC until March 31, 2022. (Moore Test.) Walls never supervised Moore during her employment with the DOC. (Cotta Test.)

Affirmative Action's investigation of Moore's complaint took longer than a typical investigation because her complaint raised an issue the DOC had not previously confronted—

---

[4] Moore nonetheless testified that the removal of the flag did not eliminate her emotional distress. (Moore Test.)

7

whether the DOC could order employees to remove or cover displays within their personal vehicles while those vehicles were on DOC property. (Darin Test. at 76-77.) It had no policies or directives in place that provided guidance on how to handle the issue, which raised First Amendment questions on which the DOC needed outside advice from the Attorney General's Office and from the OLR. (*Id.* at 77.) Darin knew that her office's handling of this complaint would set a precedent for how the DOC would handle similar complaints in the future, and she therefore wanted to make sure that the office handled it correctly. (*Id.*) In addition, Darin worried that Walls might file a grievance if he was ordered to remove the plate, so she wanted to ensure that she "dotted [her] Is and crossed [her] Ts" and that her investigation report was "airtight." (*Id.* at 72.) Finally, Darin estimated that she had "30 other [investigation] files going on at the same time," and that while Moore's complaint was "very important," Darin was still responsible for "oversee[ing] the entire unit" and could not devote all of her time to Moore's complaint. (*Id.*)

The DOC received a complaint regarding another display of a Confederate flag in a personal vehicle in a DOC parking lot at some point after it completed its investigation of Moore's complaint. (Darin Test. at 78.) In that case, the DOC "followed the exact same procedure" it followed in Moore's case, requiring the employee to remove or cover the flag while on DOC property. (*Id.*) Unlike in Moore's case, Affirmative Action resolved this second complaint "within a day or two of receiving it" because Moore's case gave it a "precedent [for how] to deal with it." (*Id.*)

## II.     CONCLUSIONS OF LAW

To prevail on her hostile work environment claim, Moore had to prove (1) that her

"workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment" and (2) that "a specific basis exists for imputing the conduct that created the hostile work environment to the [DOC]." *MacCluskey v. Univ. of Conn. Health Ctr.*, 707 F. App'x 44, 46 (2d Cir. 2017) (quoting *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)). Because I conclude that Moore failed to carry her burden to show a basis for imputing liability to the DOC, I do not address whether she met her burden of proving that the display of the Confederate flag plate created a hostile work environment.

When harassment is perpetrated by a coworker (as opposed to a supervisor), "the employer will be held liable only for its own negligence." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)). To show negligence on the part of her employer, an employee "must demonstrate that her employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Id.* (internal citations and quotation marks omitted); *see also Feingold v. New York*, 366 F.3d 128, 152 (2d Cir. 2004) ("When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.") (internal quotation marks omitted). Moore does not allege that the DOC failed to provide a reasonable avenue for complaint; rather, she claims that the DOC knew or should have known that she was suffering from harassment but failed to respond appropriately or reasonably. "Whether [the employer's] response was reasonable has to be assessed from the totality of the circumstances." *Duch* at 766 (quoting *Distasio*, 157 F.3d at 65) (internal alteration omitted). "Factors to be

9

considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.* Remedial action that is insufficiently prompt may constitute negligence on the part of the employer. *Id.* (holding that summary judgment is inappropriate if "the evidence creates an issue of fact as to whether an employer's action is sufficiently remedial and *prompt*") (emphasis in original; internal quotation marks and citation omitted).

At trial, Moore did not argue that the DOC's ultimate remedial action—requiring Walls to remove or cover the flag plate while on state property—failed to adequately address her complaint. Rather, she argued that the delay between her initial complaint on November 13, 2018[5] and the removal of the flag on May 23, 2019 made the response insufficiently prompt. But the DOC has offered reasonable explanations for the approximately six months that elapsed between Moore's initial complaint and its resolution, and, as a result, I cannot conclude that the time the DOC took to resolve Moore's complaint rendered its response negligent.

Initially, it took Moore's complaint a little over a month to wend its way through the DOC chain of command and reach Affirmative Action, but this delay does not suggest negligence on the part of the DOC. Upon receipt of Moore's complaint, Oles promptly filed an incident report. Oles and others who reviewed the complaint used the DOC's established

---

[5] To the extent Moore suggested that the DOC should have acted to remove the plate even before Moore complained about it, that argument is unpersuasive. The only supervisor who acknowledged having seen the flag before Moore complained about it was Oles, and there was no evidence at trial regarding when Oles first saw it, i.e., whether it was a day, month, or year before Moore complained. Nor was there any evidence that Oles, at the time he saw the plate, was "at a sufficiently high level in the . . . management hierarchy to qualify as a proxy for the [DOC]," was "charged with a duty to act on the knowledge and stop the harassment," or was "charged with a duty to inform the [DOC] of the harassment." *Duch*, 588 F.3d at 763 (quoting *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997)). Further, while Moore testified that it would have been "nearly impossible" to exit the Radgowski building without seeing the flag plate (Moore Test.), two of her supervisors maintained that they did not observe the plate before Moore made her complaint (Cotta Test.; Richardson Test.). Accordingly, I conclude that Moore failed to prove by a preponderance of the evidence that any of her supervisors were aware of the plate showing the Confederate flag for any significant period before she made her complaint. Nor do I find that the plate was so conspicuous that the DOC should have known of it before Moore complained about it.

channels for handling such complaints by forwarding it up the chain of command and recommending that it be referred to Affirmative Action for investigation.  As noted, that process took a little over a month, as each DOC official in the chain reviewed the complaint and then decided to forward it along.  As this process unfolded, the DOC tried to resolve the issue temporarily: one month after Moore complained to Oles, and while her complaint was still being passed up the chain of command, Deputy Warden Cotta asked Walls to remove the plate voluntarily, but Walls refused to do so.  I cannot conclude that this process of forwarding the complaint along established channels until it reached Affirmative Action was unreasonable, especially in light of the DOC's efforts to resolve the issue temporarily pending its investigation of the complaint.

      Next, Affirmative Action, confronted with an issue it had not previously encountered (how to handle a display in an employee's personal vehicle parked on DOC property) and concerned that the employee might file a grievance through the union or make a First Amendment claim if ordered to remove the plate, sought advice from Legal Affairs, the OLR, and the Attorney General's Office.  Approximately two months of the time that elapsed between Moore's complaint and its resolution was spent awaiting legal advice from other state agencies.  Darin began discussing the matter with Legal Affairs around December 7, 2018, before her office had even formally received the complaint.  (Darin Test. at 57.)  As of January 9, 2019, she had reached out to the Attorney General's Office for guidance (ex. 507 at 2), but she did not receive a response until mid-February (ex. 509 at 2).  The First Amendment question raised by Moore's complaint was not frivolous because the vanity plate was inside Walls's personal vehicle and not within the workplace itself.  *See, e.g., Erickson v. City of Topeka, Kan.*, 209 F. Supp. 2d 1131 (D. Kan. 2002) (granting summary judgment on First Amendment claim to

11

plaintiff city employee who displayed Confederate flag vanity plates in vehicle while parked in employer's parking lot). Under the circumstances, I cannot conclude that it was unreasonable for the DOC to seek legal advice on the issue from its internal counsel and from the Attorney General's Office.

Darin's decision to send one of her investigators to interview Moore regarding the basis for her complaint in order to ensure that Affirmative Action had "jurisdiction" over the complaint also delayed its ultimate resolution by approximately one month. Given Darin's concern that her investigation would face scrutiny if Walls, who had already refused to remove the plate voluntarily, complained to the union or filed a lawsuit about an order to remove it, I cannot conclude that her decision to develop a clear factual record establishing her office's jurisdiction over the matter was unreasonable.

It then took Darin about a month and a half to complete her investigation report recommending that Walls be required to remove or cover the flag. In light of both Darin's desire for her report to be "airtight" (Darin Test. at 72)—due to her concern that Walls might lodge a complaint and her belief that the report would likely serve as a "precedent" (*id.* at 78) for handling future complaints—and the fact that her office had about 30 other investigations running at time (*id.* at 72), completing the report within this time frame did not amount to unreasonable delay.

In sum, while the DOC's investigation of Moore's complaint did not move quickly, I cannot conclude that it moved so unreasonably slowly that it failed to constitute appropriate remedial action. Oles reported Moore's complaint to his superior the same day that Moore complained to him. (Ex. 502; Oles Test.) The report then worked its way steadily through DOC's established channels for addressing such complaints until it reached Affirmative Action.

12

Much of the delay in resolving the complaint after that point was attributable to Darin's efforts to address potential First Amendment issues and to ensure that her investigation and report were supported by a clear factual record, and Moore presented no evidence suggesting that Darin's belief that she required outside legal advice and that her report had to be "airtight" was not genuine or was unreasonable.  DOC's quick response to the next complaint regarding a display of a Confederate flag in a car supports Darin's testimony that the investigation of Moore's complaint took more time than was typical because it presented an issue of first impression, the resolution of which would establish a precedent for the DOC to follow in future cases.  In addition, the fact that the DOC asked Walls to remove the plate voluntarily pending its investigation, and that it acted quickly in requiring Walls to remove the plate once the Commissioner approved Darin's report and recommendation, suggests that it took Moore's complaint seriously and resolved it as soon as it was assured that there was a solid legal and factual basis supporting its action.   Accordingly, I conclude that Moore failed to meet her burden of proving that the DOC was negligent in its handling of her complaint.  Because I conclude that Moore failed to prove negligence, I do not address the issue of whether the display of the flag plate created a hostile work environment based on race.

## III.     CONCLUSION

On the basis of all the evidence and the arguments of the parties, the Court finds for the defendant on the plaintiff's hostile work environment claim and so directs the entry of judgment for the defendant.  The Clerk is directed to enter judgment and close this case.

IT IS SO ORDERED.

/s/<br>Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                June 8, 2022